Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff sues for $88,470.48, which it alleges is the value of three tugs which were requisitioned by the defendant during the war period.
Between November 24, 1942, and May 28, 1948, the defendant requisitioned 12 harbor tugs described as G. Y. T. (Gibbs Yard Tugs) upon the completion of their construction at the instance of the defendant.
During this period the plaintiff was engaged in carrying out numerous extensive construction contracts for the Navy. It was informally authorized to construct the 12 tugs and was told that they would be requisitioned upon completion.
From time to time plaintiff submitted its costs and price on the first nine of these tugs, the total for the nine being $235,844.96.
The War Shipping Administrator had authority to make determination of just compensation for small vessels requisitioned. As a matter of procedure, however, the Small Vessel Appraisal Committee submitted its appraisals as a recommendation to the Assistant Deputy Administrator for Fiscal Affairs of the War Shipping Administration, who in turn made recommendation to the Administrator.
*282 By July 2, 1943, the price as to the first nine tugs as submitted by plaintiff had been approved, with some slight modifications, and by that time or soon thereafter paid.
By letter dated June 29,1943, plaintiff submitted invoices on tugs Nos. 10, 11, and 12, the amounts being $34,344.90, $36,073.47, and $32,332.29, respectively.
WSA had an audit made of plaintiff’s books. Thereafter plaintiff submitted corrected invoices showing that the amounts for tugs Nos. 10, 11, and 12 should be $24,835.82, $28,092.13, and $25,350.95, respectively. There is no evidence that plaintiff had seen the auditors’ report before making the correction.
The Committee recommended payment of $78,278.90 for these three tugs.
This recommended determination was approved by the Assistant Deputy Administrator for Fiscal Affairs, and on January 12, 1944, the Assistant Deputy Administrator for Small Vessels wrote plaintiff offering it the sum of $78,278.90 in full settlement for these three tugs, which offer was accepted by plaintiff on January 17,1944.
On March 7, 1944, the Assistant Deputy Administrator for Small Vessels wrote the War Shipping Administrator advising him of the recommendation of the Committee as to tugs Nos. 10 and 12, and recommended that $24,835.82 be paid for No. 10, and $25,350.92 for No. 12. These sums were approved by the War Shipping Administrator on March 15, 1944, and thereafter paid.
Tug No. 11 was not mentioned in the recommendation to the War Shipping Administrator, and no action was taken by him on that tug at that time.
There followed some discussion as to certain items that had been included in the price. In July 1944 WSA officials suggested to plaintiff that it discuss the problem of costs with the WSA auditors. A conference was held and on September 4,1944, plaintiff wrote WSA as set out in finding 20, making certain explanations and asking for additional items of cost.
No further action was taken until January 1948 when plaintiff wrote again asking for payment for tug No. 11.
*283 Then on March 31,1949, the Secretary of the United States Maritime Commission, as successor to the War Shipping Administration, wrote plaintiff a letter which is set out in finding 21, and which offers plaintiff an allowance of $28,929.72 for tug No. 11, but undertakes to redetermine some items in connection with the other 11 tugs, winding up with a net offer of a balance of $250.63 on the whole contract. This offer was not accepted.
Defendant pleads the statute of limitations. However, no final determination by anyone having authority was made as to just compensation for tug No. 11 until March 31, 1949. By the terms of the Merchant Marine Act of June 29, 1936, 49 Stat. 2015, it is made the duty of the Commission to determine the value of any vessel requisitioned, and if the owner is dissatisfied with the award he may sue for such additional amount as shall constitute just compensation. Under the doctrine announced in Schaefer and Robbins v. United States, 114 C. Cls. 568, 570, that act provides for suit after such finding has been made.
The letter of the United States Maritime Commission under date of March 31, 1949, gave $28,929.72 as the value of tug No. 11. This is manifestly an error, since plaintiff had agreed to a valuation of $28,092.13.
The prices of all the tugs have been agreed upon, the prices approved by the proper authority and paid, except as to tug No. 11, for which compensation has not been paid. There are numerous collateral issues, but they finally narrow down to payment for the one tug No. 11.
Plaintiff is given judgment for $28,092.13, plus interest on that amount at the rate of four percent per annum from May 28,1943, to January 31,1948, plus interest at the same rate on $27,904 from January 31, 1948, to the time of payment, all interest being allowed not as interest but as a part of just compensation.
Defendant’s plea for a setoff is denied.
It is so ordered.
Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
*284 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at Jacksonville, Florida. It was reincorporated as Gibbs Gas Engine Company of Florida on December 29, 1941. On September 29,1945, its name was changed to Gibbs Corporation.
2. During 1942 and 1948, the plaintiff constructed 12 harbor tugs described as G. Y. T. (Gibbs Yard Tug) Nos. 1 to 12.' Each of these tugs was requisitioned by the War Shipping Administration (hereafter referred to as WSA) from the builder upon completion of construction, as follows:
TUG DATE OF REQUISITION
G. Y. T. No. 1_ -November 24, 1942
2_ _January 6, 1943
_ January 22, 1943
4ZIZIIZI _ _February 12,1943
5_ _ February 12,1943
6_ _March 8, 1943
7_ _March 8, 1943
8_ _April 2, 1943
9_ _April 2,1943
10_ _April 30, 1943
11_ _April 30, 1943
12_ _May 28,1943
3. a. In 1942 plaintiff was performing approximately nine fixed-price contracts for the Navy Department. Its yards were engaged in naval construction substantially 100 percent. Most of this work involved vessels larger than the tugs and the Navy furnished engines and other equipment.
b. Plaintiff was informally authorized to construct the tugs and was told that they would be requisitioned by the WSA upon completion. Plaintiff was furnished the necessary priority rating to acquire the material, engines and other equipment.
4. a. Under date of January 14, 1943, plaintiff wrote to WSA with respect to the first two of the tugs so requisitioned, its letter reading as follows:
*285 Pursuant to our telephone conversation of January 13, 1943, we are attaching herewith typewritten copies of the receipts for two 45 foot Diesel Tugs, requisitioned on November 24, 1942 and January 6,1943 respectively.
The cost of the first tug of this size delivered, the GYT-1, is computed as follows:
Labor_$10,392.52
Plus 40% overhead_ 4,15.7.01
Sub-total- $14,549. 53
Materials_ 12,073.48
Plus 10% handling charges_ 1,207.35
Sub-total. 13,280.83
Plus 8% profit. 2,226.43
30,056.79
Since a large portion of the work on the GYT-2 was sub-eon-tracted, we are unable at this time to furnish you with cost figures on that vessel. However, those figures will be forwarded to you as soon as the figures are received from our Sub-contractors.
It is not a customary practice of either this yard, or our Subcontractors to attempt to break down the material and labor cost on such small vessels. However, without making a change in the customary cost accounting setup, we will be able to furnish you with a cost breakdown as follows:
1. Main propelling machinery.
2. Other equipment.
3. All other materials.
4. All direct labor.
In the event this information will not be adequate, we would appreciate your advising us immediately so that we may take the necessary steps to insure the detailed information.
5. Under date of January 28,1943, plaintiff sent to WSA a form of questionnaire on G.Y.T. No. 1 which, had been submitted to it by WSA, filled out and signed by plaintiff’s secretary. Opposite the entry “Cost of original construction,” plaintiff had inserted the figures $30,056.79, and on the reverse of the form had placed the following handwritten statement, also signed by its secretary:
STATEMENT OE COST
Material_$12,073.48
10% for overhead & handling- 1,207.35
Total for material_ 13,280.83
Labor_ 10,392.52
40% overhead_ 4,157. 01
Total for labor- 14,549.53
*286 RECAPITULATION
Material_$13,280.83
Labor- 14,540. S3
Total_ 27,830.36
Plus 8% profit_ 2,226.43
Total cost_ 30,05.6. 79
I certify that the foregoing statement is true and correct.
5. a. On January 28, 1948, the Small Vessel Appraisal Committee submitted to WSA its appraisal of G.Y.T. No. 1 in the amount of $29,778.49. In its report it stated that the owner’s statement of the cost new was $30,056.79, and discussed the basis for its valuation in the following terms:
This is a newly constructed harbor tug which was requisitioned from the builder upon completion. The builder has furnished a statement of costs of construction as follows:
Material_$12, 073.48
10% overhead & handling_ 1,207.35
13,280.83
Labor_ 10,392.52
40% overhead_ 4,157.01
14,549.53
BECAPITTILATION
Material_ 13,280. 83
Labor_ 14,549.53
27,830.36
Profit 7%_ 1,948.13
29,778.49
It is considered fair to appraise this vessel at cost plus 7 percent profit for the builder.
Appraised Price: $29,778.49. Date Appraised: January 28, 1943.
&. This determination was approved by the Assistant Deputy Administrator for Fiscal Affairs of WSA.
6. a. Early in February 1943 the assistant to the Director of Small Vessel Procurement had been informed by plaintiff that the overhead allocation formula used in its invoices was an estimate based on its experience with jobs of that type, and that the formula was not applied as a standard to all work in plaintiff’s yards.
6» On February 13, 1943, the Director of Small Vessel Procurement of WSA informed plaintiff in writing that the G. Y. T. No. 1 had been appraised at $29,778.49 and offered this amount as just compensation.
*287 c. On February 26, 1948, the Assistant Deputy Administrator for Fiscal Affairs of the WSA advised the War Shipping Administrator that the Division of Small Vessel Procurement had determined just compensation for the G. Y. T. No. 1 in the amount of $29,778.49, and that plaintiff had agreed to accept this amount. He recommended that the War Shipping Administrator approve such valuation and authorize its payment. This recommendation was approved by the Administrator on March 2, 1948. This amount was thereafter paid to plaintiff for the G. Y. T. No. 1.
7. The power of the War Shipping Administrator to make final determinations of just compensation for requisitioned small vessels was never delegated to either the Small Vessel Appraisal Committee or the Director of Small Vessel Procurement. The evidence does not establish the official status or duties of the Small Vessel Appraisal Committee, but this Committee submitted its appraisals of the 12 tugs to the WSA by memoranda. Edmond J. Moran, who was successively at times material to this action the Director of Small Vessel Procurement of WSA and Assistant Deputy Administrator for Small Vessels, was charged with the duty, inter alia, of advising the Assistant Deputy Administrator for Fiscal Affairs of WSA as to valuations of small vessels. During times material to this proceeding all matters with respect to determination of just compensation for requisitioned small vessels were under the jurisdiction of the Assistant Deputy Administrator for Fiscal Affairs, who would make recommendations with respect thereto to the War Shipping Administrator. The evidence fails to establish that the Assistant Deputy Administrator for Fiscal Affairs had authority to make final determinations of just compensation as to requisitioned small vessels.
8. a. By letter dated May 5,1943, plaintiff transmitted to WSA completed questionnaires and invoices relating to the vessels G.Y.T. No. 2 through G.Y.T. No. 9. This letter, so far as material, reads as follows:
Our method of billing is the same as was employed in the billing of the Gibbs yard #1 36-foot steel tug and the GYT #1 with the exception of subcontract work.
As explained at the time of the writer’s visit to your office last February, we subcontracted a large portion of the work on the *288 GYT #2 through GXT #12 inclusive so that delivery could be speeded up.
A great deal of supervision on our part was necessary to obtain good workmanship and early delivery of the tugs built by our subcontractors since this work had to be subcontracted to companies not regularly engaged in shipbuilding. We do not feel that the 10% handling charge which we have added to our subcontract labor and material cost will quite cover our actual expenses in the supervision of this work, but, since the item of 10% for handling materials has already been settled, we are willing to apply the 10% handling charge to our subcontract work also. The cost of GXT #1 was $29,778.49 and you can readily see that we have been able to effect a saving on each one of the vessels for which we are now rendering an invoice.
The invoices we are submitting are as follows:
Invoice 2571 — GXT #2_$28,493.96
Invoice 2572 — GXT #3_ 27,113. 81
Invoice 2573 — GXT #4_ 26,876.47
Invoice 2574 — GXT #5_ 25,793.87
Invoice 2575 — GXT #6_ 24, 647. 72
Invoice 2576 — GXT #7_:_ 24,902.43
Invoice 2577 — GXT #8_ 24,297.55
Invoice 2578 — GXT #9_ 23,940.66
The cost of the GXT #10 through GXT #12 will be slightly higher than these figures since the work was subcontracted to a different company which was not quite as efficient as the one which did most of the steel work on the GYT #2 through GXT #9.
We realize that formal papers and public vouchers will have to be prepared before we can obtain payment of our invoices and submit them at this time only as detail information supporting the cost which we show on your informal return.
The GXT #1 was requisitioned on January 6, 1943, and the other vessels were requisitioned at intervals between that time and April 2, 1943. We were unable to submit our cost until this time due to the fact that since the vessels were identical, it was more economical to set up their construction in one lot rather than to perform each job individually and for this reason we were unable to give you the cost of the GYT #2 until all of the other vessels in the same lot were completed. The difference in cost for each vessel is due largely to two reasons, the first being that, while a portion of the work was done under the same work order as work for all of the other vessels and was therefore charged to the vessels pro rata, a part of the work was done for the account of the individual vessel and directly charged to the vessel. The same is true for the material cost though there is a much smaller variation in this item.
5. Submitted with this letter were invoices, which can be summarized as follows:
OVERHEAD EXPENSE
PER-DIRECT COSTS CENT AMOUNT TOTAL
Labor...$13,527.57 40 $5,411.03 $18,938.60
Material- 95, 617. 08 10 9, 561. 71 105, 178. 79
Subcontract Cost... 62, 243. 72 10 6, 224. 38 68, 468. 10
Total Cost.. 171, 388. 37 _. 21,197.12 192,585.49
Profit at 7%- 13, 480. 98
Total. 206, 066. 47
*289 c. The questionnaires enclosed with, said letter set forth costs of the vessels identical with the costs stated in the letter, and with the total of the related invoice. In no case, however, did this figure appear opposite the notation, “Cost of original construction”, that space being blank in each questionnaire, but rather opposite the notation, “Describe in detail any improvements or betterments made by present owner, giving date and cost of improvements”.
9. On May 27,1948, the Small Vessel Appraisal Committee submitted to WSA separate appraisals of these eight vessels; In each case its appraisal was identical with plaintiff’s invoice figure, and each appraisal set forth the information appearing on the invoice, prefaced by the statement, with minor grammatical variations, “The builder has submitted the following statement of construction cost.” Each of these was approved by the Assistant Deputy Administrator for Fiscal Affairs of WSA and was endorsed by Edmond J. Moran.
10. Under date of June 25,1948, the Assistant Deputy Administrator for Fiscal Affairs of WSA, by memorandum approved by Edmond J. Moran as Director of Small Vessel Procurement, advised the War Shipping Administrator of value determinations by the Division of Small Vessel Procurement, and recommended that the Administrator approve such valuations and authorize their payment. This recommendation was approved by the Administrator on June 29, 1943.
11. On June 30, 1943, the Executive Assistant to the General Counsel of WSA transmitted to plaintiff formal offers of the sums set forth above for each of these eight vessels. These offers were accepted by plaintiff on July 2, 1943, and payment was thereafter made.
12. By letter dated June 29, 1943, plaintiff submitted to WSA invoices and questionnaires relating to tugs G. Y.T. Nos. 10, 11 and 12. This letter read as follows:
We attach herewith the information requested in your form questionnaire on the requisitioned vessels GYT #10-12 inclusive, which were requisitioned under Requisition Authorization #98.
We are also submitting herewith our invoices in triplicate covering these vessels, which are submitted at this time to provide you with detailed information as to our cost and method of billing. The method used is the same as was employed in the billing of the GYT #2 through 9.
*290 As explained in onr letter of May 5, 1943, the cost of the GYT 10-12 is a little higher than any of the other vessels. To complete these vessels within the allotted time, it was necessary for us to sub-contract a sizable portion of the work, and the firm which contracted to build the last three vessels was unable to produce them at as low a figure as the previous eight were built.
We would appreciate your expediting the preparation of formal papers and public vouchers which will have to be prepared before we can obtain payment of our invoices.
The questionnaires enclosed with this letter gave the cost of these three tugs as $34,344.90, $36,073.47, and $33,332.29, respectively. The invoices for the three tugs set forth the following figures:

GYT §10 GYT §11 GYT IS

6, 390. 37 5, 045. 85 4,140.16
20, 218. 04 29, 557. 22 16, 488. 67
Labor Cost_ $4, 564. 55 $3, 604. 18 $2, 957. 26
Plus 40% Overhead-1, 825. 82 1, 441. 67 1,182. 90
Materials_ 570. 61 208. 52 225. 92
Plus 10% Handling Charge. 1, 257. 06 1, 302. 85 1,122. 59
Subcontract Work_ 800. 00 853. 00 330. 00
Plus 10% Handling Charge. 1, 080. 00 1, 285. 30 1, 333. 00
Total Cost. 32, 098. 04 33, 713. 52 31,151. 67
7% Profit_ 2, 246. 86 2, 359. 95 2,180. 62
Total_ 34,344.90 36,073.47 33,332.29
13. a. WSA had an audit made of plaintiff’s books by its principal auditor. Thereafter, plaintiff submitted corrected invoices with a letter dated September 17,1943. This letter read as follows:
On June 29, 1943, we submitted three invoices covering the cost of GYT 10-12, inclusive. With this billing, we indicated a cost of $34,344.90 for the GYT-10, a cost of $36,073.47 for the GYT-11 and a cost of $32,332.29 for the GYT-12. These amounts were in error.
Subsequent to our original submission of these figures, we were audited by Mr. Timberlake of the U. S. Maritime Commission. In the course of this audit, it was discovered that there had been an error in the setting up of a charge against this contract. This error was due to the inclusion of three engines in the cost of this contract which were ordered under the same purchase order but were for another contract. The error is regrettable, but such errors do occur when operating at increased capacity and with the help of only inexperienced personnel.
The assistance given us by Mr. Timberlake is greatly appreciated. Up to the time of his visit, the account had not been completely audited and the person assigned to compiling the information for billing purposes had relied upon the accuracy of cost distribution by another clerk in the office who was, incidentally, replaced a short time prior to Mr. Timberlake’s visit because of unsatisfactory work. After Mr. Timberlake’s visit, the accounts *291 were completely re-checked by us and we feel sure that the invoices which we are now rendering will be reasonably accurate costs on the three boats covered, and accurate figures when considering the cost of the entire lot.
We would appreciate your passing these corrected invoices for whatever verification is necessary as to cost, and placing them in line for payment as soon as possible, since this represents about $75,000.00 on work which was delivered in April and May.
b. The corrected invoices enclosed with this letter set out the following figures:

GYT #11 GYT §1Z GYT §10

Labor Cost_ $3, 544. 69 $3, 604. 18 $2, 957. 26
Plus 40% Overhead_ 1, 417. 88 1, 441. 67 1, 182. 90
4, 962. 57 5, 045. 85 4, 140. 16
Materials_ 5, 789. 53 6, 427. 44 4, 444. 84
Plus 10 % Handling Charge. 578. 95 642. 74 444. 48
11, 331. 05 12,116. 03 9, 029. 48
Subcontract Work_ 10, 800. 00 12, 853. 00 13, 330. 00
Plus 10% Handling Charge. 1, 080. 00 1, 285. 30 1, 333. 00
Total Cost_ 23, 211. 05 26, 264. 33[1] 23,692.48
7% Profit_ 1, 624. 77 1, 837. 80 1, 658. 47
Total_ 24, 835. 82 28, 092. 13 25, 350. 95
1. There is no evidence that any of plaintiff’s representatives had seen the audit report of Mr. Timberlake questioning rates of overhead at the time plaintiff submitted corrected invoices on September 17,1943. Timberlake has since died.
14. a. On January 6, 1944, the Small Vessel Appraisal Committee submitted to WSA, by memorandum endorsed by Edmond J. Moran and others, its appraisal of the tugs G.Y.T. Nos. 10, 11 and 12. The Committee did not state separate values for the three vessels, but valued the three at $78,278.90, the total of the amounts of the corrected invoices. Its appraisal memorandum contained the following statement:
Requisitioned May 28, 1943, at time of completion.
The original total amount asked by the owner for these three tugs was $103,750.66. We then had a thorough audit made by K. B. Timberlake, Principal Auditor for General Auditor of Operations to check costs of construction.
Report of auditor, made August 20, 1943, was that total cost of the three tugs was $88,470.48. The owner then sent us, on September 11, 1943, corrected invoices and claims amounting to *292 the total sum of $78,278.90. After the audit the owner admitted he had made an error when he sent original asking price and original representations as to cost. The sum of $78,278.90 is considered to be just compensation as of this date. It is $25,471.76 less than the cost as originally represented, and appears to he reasonable and in conformity with the Keport of the Advisory Board on Just Compensation, dated December 7, 1943.
Appraisal of Just Compensation: $78,278.90.
Date Appraised: January 6, 1944.
b. This recommended determination was approved by the Assistant Deputy Administrator for Fiscal Affairs of WSA.
15. On January 12, 1944, the Assistant Deputy Administrator for Small Vessels of WSA wrote plaintiff offering it the sum of $78,278.90, in full satisfaction of all claims for just compensation, for the three tugs, G.Y.T. Nos. 10, 11 and 12. This offer was accepted by plaintiff on January 17, 1944.
16. On March 7,1944, the Assistant Deputy Administrator for Small Vessels wrote to the War Shipping Administrator, advising him that the Division of Small Vessel Procurement recommended that the sum of $24,835.82 be paid for the G.Y.T. No. 10, and the sum of $25,350.92 for the G.Y.T. No. 12 (which the Division had found “represent sums which would justly compensate the owners for their property”), and recommending that the Administrator approve such valuations and direct the payment of such sums. No mention was made of the G.Y.T. No. 11 in this memorandum. The War Shipping Administrator approved these recommendations on March 15, 1944, and plaintiff was thereafter paid the sums recommended.
17. The WSA auditor who examined plaintiff’s books confirmed in total the material and subcontract costs, as shown by plaintiff’s invoices on tugs G.Y.T. Nos. 1 through 9, and the corrected invoices subsequently issued on tugs G.Y.T. Nos. 10, 11 and 12, although he did change the allocation of the material costs somewhat as between vessels. With respect to labor costs, he found a total of $1,019.86 which had been incorrectly charged, and this total sum was eliminated by plaintiff on the corrected invoice for G.Y.T. No. 10. He reported that the plaintiff’s overhead costs on all its work as of December 31, 1942 (according to the allowance by a Naval Cost Inspector who had audited plaintiff’s books) aggregated 29.237 percent of direct labor. Applying this *293 rate to the costs which he found for each of the vessels, he arrived at the following costs, and costs plus seven percent profit, for each of the vessels.

18. a. Plaintiff did not allocate its overhead to specific jobs. It included an allowance for overhead in its price on each job in an amount deemed by it to be adequate to reimburse it for its total overhead expenses. Overhead costs were not distributed directly to jobs performed in its yards.
b. There is no evidence as to any method employed by plaintiff during any part of the period involved in the construction of the 12 tugs in allocating overhead to or absorbing overhead out of the revenues on specific jobs. The formula used in its invoices for the tugs was an estimate. It had been plaintiff’s practice prior to the tug requisitions to allocate ten percent of overhead on material costs and subcontracts in connection with repair and contract jobs in its yards, but the exact method of allocating overhead varied depending on the characteristics of the particular job, the relative proportions of labor and materials involved, and competitive requirements.
o. From an accounting standpoint there is no requirement that a contractor employ the same formula for overhead allocation throughout all of its contracts during the same period. The formula employed by plaintiff in its invoices to defendant for allocation of its overhead in the construction of the 12 tugs was fair and reasonable and did not produce a result inconsistent with the ratio of actual overhead to total direct costs throughout all of plaintiff’s jobs during 1942 or 1943, or during a combination of both years.
*294 19. a. The following figures represent (1) plaintiff’s total direct labor and material, and overhead on all of its work during 1942 and 1943, (2) plaintiff’s total direct labor and material, and overhead charged in the construction of the 12 tugs according to plaintiff’s books and invoices, and (3) plaintiff’s total direct labor and material, and overhead in the construction of the 12 tugs according to the Timberlake report:
(1) (2) (3)
Direct Labor. . $7, 563, 963. 91 $34, 026. 22 $34, 026. 22
Direct Material_ 11, 289, 161. 67 223, 579. 08 223, 579. 14
Direct Costs_ 18, 853, 125. 58 257, 605. 30 257, 605. 36
Overhead_ 3,450,845.71 35,968.39 9,948.25
22, 303, 971. 29 293, 573. 69 267, 553. 61
% of overhead to direct costs_ 18.30% 13.96% 3.86%
Relative proportion of material to labor 1.49 to 1 6.57 to 1 _
b. For the year 1942 plaintiff’s total direct labor ($2,904,-409.99) and material ($6,634,657.43) on all of its work was $9,539,067.42. Its overhead was $1,358,879.67, and the percentage of its overhead to direct costs was 14.2%.
o. For the year 1943 plaintiff’s total direct labor ($4,659,-553.92) and material ($4,654,504.24) on all of its work was $9,314,058.16. Its overhead was $2,091,966.04, and the percentage of its overhead to direct costs was 22.4%.
20. In July 1944, WSA officials suggested to plaintiff that it discuss the problem with the WSA auditors to attempt to reach a solution. A conference was held, and on September 4,1944, plaintiff wrote to WSA as follows:
On page 3 of Mr. Timberlafce’s letter under the heading “Overhead,” Mr. Timberlake advises that he used the Navy’s average overhead for the yard, 29.237% in determining our profit, rather than the overhead submitted on our invoices. The overhead arrived at by the Navy is the overhead of our entire yard covering all of our lump sum contracts, which amounted to some $1,500,000 a month. It is impossible to believe that this small complicated job could be performed at an overhead cost no larger than the average overhead for the entire yard. Not only was this contract a small contract with a different contracting agency from the one with which we were doing business, but the boats built under this contract had to be developed and designed by this company. This necessitated an increased technical staff, not only in the Engineering Department, but right through to final inspection.
To further complicate the contract, it was found that it was impossible to build these vessels in our own plant, as it was *295 filled with prior and more urgent orders, necessarily we had to go to plants not then doing war work and use their facilities and labor. This work is listed on this report as subcontract. Unfortunately, these plants were not familiar with this type of construction and it was necessary for us to do all of their planning in our own yard. For example we had to make all the templates and patterns for the plates in this yard and these were charged to our overhead. These plants were not familiar with the problems of securing materials during a war and it was necessary for us to secure and expedite practically all of the materials used by these subcontractors, such as steel, engines, et cetera. The engines were practically impossible to secure and in one instance an engine was actually built by us out of parts. All of the expense involved in securing this material was of course charged to overhead.
Many times we had to send men into the smaller towns in this vicinity to pick up one plate at a time from warehouses and other contractors. We made innumerable calls and some trips to the engine builders to try to expedite the machinery for these boats. In our normal operation, all machinery was furnished by the Government.
Knowing these facts and all the other conditions under which this contract was performed, I am certain that the cost of securing the materials and subcontracts listed on Mr. Timberlake’s report are in excess of the 10% charged by us. Bearing this in mind, I feel that we are entitled to the $14,469.56 handling charge on the materials and the $9,922.68 handling charge on subcontracts. We will accept this amount as full settlement of this contract.
21. There is no evidence of any further action taken on this matter until January 1948, when plaintiff again requested payment of the $28,092.13, which had been determined as Íust compensation for the G.Y.T. No. 11. There were discussions and correspondence concerning the matter thereafter. On March 31,1949, the Secretary of the United States Maritime Commission, as successor to the War Shipping Administration, wrote plaintiff as follows:
This is to advise you that the Maritime Commission has reconsidered the amounts previously determined by the Administrator, War Shipping Administration, for the tugs GYT No. 1 through 9, 10 and 12, and has found, in accordance with Section 902 of the Merchant Marine Act, 1936, as amended, as said Section is construed by applicable decisions of the Comptroller General, that the just compensation for these tugs, including Tug No. 11, is as follows:
GXT #1__ $27,724.55
#2_. 23,322.77
#3-22,322. 73
#4-21,978. 71
#5__. 21,197.32
#6_ 20,282. 67
20,717.86
8_ 20,280.98
19,984.29
10-28,044.45
*296 GYT #12_$31,496:31
257,352. 64
“ #11_ 28,929. 72
Total_ 286,282.36
The Commission has also found that the difference between the amount heretofore paid by the War Shipping Administration for the tugs GYT Nos. 1 through 9, 10 and 12 ($286,031.73) and the amount found by the Commission as just compensation for said tugs ($257,352.64) or $28,679.09, constitutes a payment in excess of just compensation for said tugs, and that pursuant to Public Paw 269, 80th Congress, the amount of the overpayment ($28,679.09) be offset against the amount determined by the Maritime Commission as just compensation for the Tug GYT No. 11 ($28,929.72), leaving a balance due to the person or persons entitled thereto on account of just compensation for said tug of $250.63.
You are hereby tendered for and on behalf of the United States of America, represented by the Maritime Commission, the sum of $28,929.72 less the overpayment referred to above ($28,679.09) or $250.63, in full settlement of all claims for just compensation arising out of the requisition of the GYT No. 11.
If the foregoing is acceptable to you, kindly indicate your acceptance thereof by signing the enclosed copy of this letter and returning same to this office. Upon receipt of your acceptance, the necessary documents to complete the transaction will be prepared and forwarded to you for execution. Thereafter, you or the person entitled to receive payment will be paid as expeditiously as possible.
22. The fail' and reasonable value of and just compensation for the 12 tugs at the time and place of requisition was $314,123.86, including $293,513.71 for costs and $20,550.15 for profit at seven percent. Plaintiff received payment of $286,031.73 for all 12 tugs except Tug No. 11. The balance of $28,092.13 is the fair and reasonable value of and just compensation for Tug No. 11 at the time and place of requisition.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States twenty-eight thousand ninety-two dollars and thirteen cents ($28,092.13) with interest thereon at the rate of four percent per annum from May 28, 1943, to January 31, 1948, together with interest at the same rate on twenty-seven thousand nine hundred and four dollars ($27,904) from January 31, 1948, to date of payment, all interest being allowed not as interest but as a part of just compensation.

 Tils addition in the invoice was erroneous, the correct total being $26,254.33. It was only a typographical error, however, since both the profit and total figures are correct.